## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PCH MUTUAL INSURANCE
COMPANY, INC.,

     *Plaintiff*,

     v.

CASUALTY & SURETY, INC.,

     *Defendant*.

Civil Action No. 08-00282 (CKK)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
(November 15, 2010)

This action arises out of an alleged breach of an Administrative Services Agreement (the "Agreement") entered into by and between Plaintiff PCH Mutual Insurance Company, Inc. ("PCH") and Defendant Casualty & Surety, Inc. ("CSI"). After removing this action from the Superior Court for the District of Columbia, CSI filed a [8] Motion to Compel Arbitration and Stay Proceedings. Finding that a genuine issue was presented as to whether the parties' Agreement provides for mandatory arbitration of disputes arising out of the Agreement, this Court conducted a one-day bench trial on the threshold question of arbitrability. Based on the evidence adduced at trial, the Court concludes that CSI has failed to meet its burden of establishing the existence of a mandatory agreement to arbitrate. Accordingly, the Court shall DENY CSI's [8] Motion to Compel Arbitration and Stay Proceedings. The Court's Findings of Fact and Conclusions of Law are set forth below.

## I.  PROCEDURAL BACKGROUND

On January 22, 2008, PCH filed a four-count complaint against CSI in the Superior Court for the District of Columbia (Case No. 08-00499). *See* Compl., Docket No. [1-4]. On February

19, 2008, CSI removed the case to this Court, and, on March 7, 2008, filed a Motion to Compel

Arbitration and Stay Proceedings. *See* Def.'s Not. of Removal, Docket No. [1]; Def.'s Mot. to

Compel Arbitration and Stay Proceedings, Docket No. [8]. PCH opposed the motion, CSI filed a

reply, and PCH filed a sur-reply. *See* Pl.'s Mem. in Opp'n to Mot. to Compel Arbitration and

Stay Proceedings, Docket No. [15]; Def.'s Reply Br. to Pl.'s Opp'n to Def.'s Mot. to Compel

Arbitration and Stay Proceedings, Docket No. [19]; Pl.'s Sur-Reply in Opp'n to Def.'s Mot. to

Compel Arbitration and Stay Proceedings, Docket No. [22-1].

On August 5, 2008, after conducting a searching review of the parties' respective

submissions, this Court concluded that a genuine issue existed as to whether the Agreement

provides for mandatory arbitration of disputes. *See PCH Mut. Ins. Co., Inc. v. Cas. & Sur., Inc.*,

569 F. Supp. 2d 67, 69 (D.D.C. 2008). Because the making of an agreement for arbitration was

"in issue," the Court, consistent with the requirements of the Federal Arbitration Act, determined

that further limited proceedings were necessary to determine the arbitrability of the parties'

dispute. *Id.* at 77; *see also* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . be in

issue, the court shall proceed summarily to the trial thereof."). Accordingly, this Court

conducted a one-day bench trial on the threshold question of arbitrability. *See* Min. Order (Feb.

3, 2009); Tr. of Bench Trial (Feb. 2, 2009) ("Tr."), Docket No. [61].

During the course of the trial, the Court heard live testimony from three witnesses and

received documentary evidence presented by the parties. Thereafter, CSI and PCH each

submitted proposed Findings of Fact and Conclusions of Law for the Court's consideration. *See*

Pl.'s Proposed Findings of Fact and Conclusions of Law, Docket No. [53]; Def.'s Proposed

Findings of Fact and Conclusions of Law in Respect of Limited Trial on Arbitrability, Docket

No. [54].  CSI also filed a rebuttal to PCH's proposed Findings of Fact and Conclusions of Law. *See* Def.'s Resp. to Pl.'s Proposed Findings of Fact and Conclusions of Law, Docket No. [58]. The matter is now fully briefed and ripe for adjudication.

## II.  FINDINGS OF FACT[1]

After listening to the testimony presented at trial, personally observing the demeanor and credibility of the witnesses,[2] reviewing the evidentiary record, and making all reasonable inferences to be drawn therefrom in accordance with the Federal Rules of Evidence, the Court finds that the following facts have been established by a preponderance of the evidence:

### A.    The Parties

1.    Plaintiff PCH is a "risk retention group" domiciled in the District of Columbia providing insurance coverage to assisted living facilities in Pennsylvania and neighboring states. Pl.'s Ex. 4 (Agreement) at 1; Def.'s Ex. I (Dec. 10, 2003 Ltr. from T. Winch to D. Condon) at CSI49.

2.    Broadly speaking, a "risk retention group" is a corporation or limited liability company designed to assume and spread the liability exposure of its group members – *i.e.*, businesses that are engaged in similar or related fields (here, assisted living services).  *See* 15 U.S.C. § 3901(a)(4).  Risk retention groups provide a vehicle for businesses that cannot readily

---

[1]  To the extent practicable, the Court has attempted to segregate its findings of fact and conclusions of law.  Nevertheless, to the extent matters designated as findings of fact may be considered conclusions of law, they shall be deemed conclusions of law.  Similarly, to the extent matters expressed as conclusions of law may be considered findings of fact, they shall be deemed findings of fact.

[2]  Except as specifically noted herein, the Court found the testimony of each of the three witnesses presented at trial – David Condon and James Godfrey, on behalf of CSI, and Jon Harkavy, on behalf of PCH – to be, as a general matter, credible.

obtain insurance on favorable terms to essentially "self-insure their own risk" and obtain access to reinsurance markets.  Tr. at 18:15-18:25 (Condon Test.).

3.      Defendant CSI is an insurance wholesale broker and insurance program manager based in Alabama and operating in approximately thirty-nine states across the country.  Tr. at 89:8-89:15 (Godfrey Test.); Pl.'s Ex. 4 (Agreement) at 1.

## B.      *Early Discussions Surrounding The Formation Of PCH*

4.      The events surrounding the formation of PCH were the subject of a fair amount of attention at trial, in part because PCH was not actually formed until on or about April 29, 2004, when its Articles of Incorporation were filed with the D.C. Department of Insurance and Securities Regulation, meaning that PCH was not formed until shortly after the agreement containing the "arbitration clause" now at issue was negotiated and executed.  Tr. at 39:14-39:25 (Condon Test.); Pl.'s Ex. 4 (Agreement) at 1; Pl.'s Ex. 5 (Articles of Incorporation) at CSI45.

5.      Several parties, corporate and individual, had a hand in the formation of PCH, but its origins are found in preliminary discussions between James Godfrey ("Godfrey"), CSI's President and founder, and Brian Barrick ("Barrick"), a retail insurance agent operating his Personal Care & Assisted Living Insurance Center ("PCALIC") out of Pennsylvania.  Tr. at 17:11-17:13, 69:4-69:9 (Condon Test.); Tr. at 88:12-89:5 (Godfrey Test.); Pl.'s Ex. 7 (Feb. 20, 2004 E-mail from B. Barrick to D. Condon) at PCH000005.

6.      Specifically, sometime in 2002 or 2003, Godfrey and Barrick discussed the difficulties that an assisted living facility association familiar to Barrick was having in obtaining satisfactory insurance coverage.  Tr. at 90:17-90:24 (Godfrey Test.).

4

### C.    Condon Enters The Scene And Animates The Formation Process

7.    As a outgrowth of their discussion, Godfrey arranged for Barrick to speak with David Condon ("Condon"), an insurance wholesale broker working for CSI who, among other things, assists in the creation of insurance programs.  Tr. at 15:18-16:2, 17:23-18:6 (Condon Test.); Tr. at 89:18-89:22, 90:21-91:3 (Godfrey Test.).

8.    At some point in 2003, Condon and Barrick discussed the possibility of creating an insurance program to better meet the needs of assisted living facilities.  Tr. at 17:23-18:6 (Condon Test.).  Condon, who had some prior experience with risk retention groups, was first to propose forming a risk retention group as a possible insurance coverage alternative for assisted living facilities.  Tr. at 17:19-17:22, 18:7-18:12 (Condon Test.).

9.    At some unidentified point early on in this process, Barrick approached Matt Harvey ("Harvey"), the President of an association of assisted living facilities in Pennsylvania, to determine whether the association's membership would support the formation of a risk retention group.  Tr. at 72:7-73:1 (Condon Test.).

10.    As discussions progressed, Condon assumed an important – but by no means exclusive – role in coordinating the formation of PCH as a risk retention group for assisted living facilities.  Indeed, Condon was the self-described "motivating force" in the formation of PCH.  Tr. at 66:3-66:14 (Condon Test.).

### D.    Condon Brings Risk Services Into The Formation Process

11.    Condon assumed responsibility for establishing relationships with various service providers for the future PCH – *e.g.*, vendors, reinsurers, and third-party administrators.  Tr. at 66:3-66:11 (Condon Test.).  Most notably, in or about late 2003, Condon reached out to non-

party Risk Services, LLC ("Risk Services"), inviting Risk Services to become involved in the formation of PCH. Tr. at 30:13-30:25 (Condon Test.).

12.     Condon had previously worked with Risk Services – a company that, among other things, provides services to risk retention groups across the United States and in offshore domiciles – in setting up an unrelated risk retention group for intermodal trucking companies in California. Tr. at 20:9-20:11, 30:13-30:25 (Condon Test.).

13.     On or about November 4, 2003, Condon wrote Mike Rogers, President of Risk Services, enclosing what he described as "a rather complete proposal" for the formation of PCH. Pl.'s Ex. 2 (Nov. 4, 2003 Ltr. from D. Condon to M. Rogers) at CSI47; *see also* Tr. at 35:23-37:4 (Condon Test.).

14.     On or about December 10, 2003, Risk Services responded to Condon's letter with one of its own, describing, among other things, Risk Services' anticipated role in connection with the formation of PCH. Def.'s Ex. I (Dec. 10, 2003 Ltr. from T. Winch to D. Condon); *see also* Tr. at 37:12-38:1 (Condon Test.).

15.     That role, at least as envisioned by Risk Services, would include serving as PCH's Captive Insurance Company Manager, consulting with PCH to develop an appropriate organizational structure, facilitating regulatory approval of the risk retention group, acting as a "liaison" between PCH and its service providers in preparing the documents required for regulatory approval, working with PCH to ensure that it had the requisite capitalization, and, subsequent to formation, overseeing internal financial management and regulatory compliance. Def.'s Ex. I (Dec. 10, 2003 Ltr. from T. Winch to D. Condon) at CSI55; Tr. at 29:2-29:14 (Condon Test.); Tr. at 99:19-99:24 (Harkavy Test.).

16.     In exchange for these services, Risk Services anticipated receiving some amount of compensation, most likely a percentage of the gross earned premium payments received by or on behalf of PCH for liability insurance coverage.  Def.'s Ex. I (Dec. 10, 2003 Ltr. from T. Winch to D. Condon) at CSI53.  The precise form the compensation Risk Services expected is immaterial; all that matters is that Risk Services, like all the parties involved, had a financial interest in facilitating the formation of PCH.

### E.     The Agreement Between PCH And CSI

17.     From the outset, CSI was expected to serve as the Program Administrator for the future PCH.  In accordance with this expectation, on March 31, 2004, CSI and PCH entered into an Administrative Services Agreement (that is, the Agreement), pursuant to which CSI was to provide program administrative services for the future PCH's liability insurance programs.  Pl.'s Ex. 4 (Agreement) at 1.

18.     The Agreement was executed by Godfrey, on behalf of CSI, and Harvey, on behalf of PCH.  Tr. at 60:2-60:5, 76:7-76:16 (Condon Test.); Pl.'s Ex. 4 (Agreement) at 7.  Although PCH was technically about a month shy of incorporation at the time the Agreement was executed, Harvey subsequently became the first president of PCH and a member of its Board of Directors.  Tr. at 73:7-73:16 (Condon Test.); Pl.'s Ex. 5 (Articles of Incorporation) at CSI46.  In any event, neither party has suggested that the Agreement is not binding on PCH on this basis.

19.     As the Program Administrator, CSI was responsible for, among other things, the development, preparation, and issuance of insurance policies and adherence to insurance underwriting guidelines.  Pl.'s Ex. 4 (Agreement) ¶ 2.

20.     At least within the contours of the Agreement itself, in its role as Program

Administrator, CSI would operate as an independent contractor. Pl.'s Ex. 4 (Agreement) ¶ 2(c).

21.    In exchange for its services as Program Administrator, CSI was entitled to some amount of compensation, a fee tagged to the percentage of the gross earned premium payments received by or on behalf of PCH for liability insurance coverage. Pl.'s Ex. 4 (Agreement) ¶ 8. Again, the precise form the compensation CSI expected is immaterial; all that matters is that CSI, like all the parties involved, had a financial interest in facilitating the formation of PCH.

22.    The parties' contractual relationship was, absent further action, designed to be ten years in duration; the Agreement would expire by its terms on March 31, 2014. Pl.'s Ex. 4 (Agreement) ¶ 1.

23.    Three specific provisions of the Agreement merit further attention here. First, Paragraph 17 of the Agreement (the "Arbitration Clause") – the locus of the parties' disagreement at this stage of the proceedings – provides as follows:

> 17.    **Arbitration.** Any disputes concerning any aspect of this Agreement may be submitted to binding arbitration. The prevailing party shall be entitled to recover all costs incurred, including reasonable attorney's fees.

Pl.'s Ex. 4 (Agreement) ¶ 7.

24.    Second, Paragraph 14 of the Agreement (the "Injunction Clause") provides as follows:

> 14.    **Injunction.** In the event that [CSI], its employees, agents, brokers and/or representatives, attempt to breach the terms of this Agreement, [PCH] shall, in addition to its rights and remedies available to it at law or in equity, have the right to seek an injunction against [CSI] to enforce the provisions of this Agreement. [CSI] agrees to be responsible for and to reimburse [PCH] for any attorney's fees and costs

associated with any legal action taken by [PCH] to enforce the terms of this Agreement.

Pl.'s Ex. 4 (Agreement) ¶ 14.

25.     Finally Paragraph 23[3] of the Agreement (the "Savings Clause") provides as follows:

> [23].     **Partial Validity.**   If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any exten[t] be invalid or unenforceable, the remainder of the Agreement . . . shall not be affected thereby, and each term and provision of the Agreement shall be enforced as written to the fullest extent permitted by law.

Pl.'s Ex. 4 (Agreement) ¶ 23.

### F.     Drafting The Agreement: The Limited Involvement Of The Signatories

26.     Moving backwards in time, the evidence presented at trial concerning the drafting of the Agreement between CSI and PCH was far from illuminating.  This is particularly true with respect to the Arbitration Clause, which was indisputably not the subject of much, if any, attention by the participants in the drafting process.

27.     As an initial matter, the record is nearly devoid of evidence concerning the thought processes and intentions of the only two signatories to the Agreement – namely, Godfrey and Harvey.

28.     Godfrey had little personal involvement in the preparation of the Agreement

---

[3]  The final six paragraphs of the Agreement are misnumbered, with the paragraph following Paragraph 19 erroneously labeled as Paragraph 16.  As labeled, the Agreement has two each of paragraphs numbered 16, 17, 18, and 19.  For ease of reference, the Court shall refer to the first set of paragraphs so-numbered as Paragraphs 16 through 19, and shall refer to the misnumbered paragraphs as if they had been sequentially numbered – *i.e.*, as Paragraphs 20 through 25.

between CSI and PCH; his participation was essentially limited to the early discussions surrounding the formation of PCH, his execution of the Agreement on CSI's behalf, and his extension of a $130,000 loan to PCH to ensure that it would have sufficient capital for its formation. Tr. at 90:12-91:24 (Godfrey Test.).

29.     Godfrey testified that, prior to signing, he reviewed the Agreement, including the Arbitration Clause, and that CSI generally "look[s] for an arbitration agreement to be" included in insurance agreements. Tr. at 93:6-93:10, 93:17-93:18 (Godfrey Test.). He also testified that he reviewed the Injunction Clause, and that, although unclear as to its meaning, he assumed that it did not pertain to CSI and did not affect the Arbitration Clause. Tr. at 95:13-95:17 (Godfrey Test.).

30.     Godfrey's relatively cursory testimony, admittedly predicated upon his "brief[]" perusal of the Agreement, Tr. at 93:9-93:10 (Godfrey Test.), did not address the specific language of the Arbitration Clause or the Injunction Clause nor tie his proffered interpretation to any discussions with PCH or any of its representatives (or even with CSI's representative in the drafting process, Condon). As a result, the Court finds Godfrey's generalized testimony only minimally probative of the parties' understanding of the Agreement. Nevertheless, the Court shall consider Godfrey's testimony to the extent it may reflect CSI's one-sided interpretation of the Arbitration Clause.

31.     Meanwhile, the record has nothing specifically to say of Harvey's understanding of the Arbitration Clause (or, for that matter, any part of the Agreement), as neither CSI nor PCH sought to introduce any testimony or evidence from Harvey, the signatory on PCH's behalf.

10

### G.    Drafting The Agreement: The Limited Involvement Of PCH

32.    Not only did the parties fail to cultivate the record with respect to Harvey's understanding of the Agreement between CSI and PCH, but they neglected to introduce any relevant testimony or evidence concerning the participation of *anyone* acting on behalf of the future PCH in the process of drafting the Agreement.

33.    Notably, Condon admitted, consistently with the other evidence presented at trial, that he did not view Risk Services as negotiating on behalf of PCH in the context of drafting the Agreement.  Tr. at 85:11-85:20 (Condon Test.).

34.    Moreover, to the extent Condon's testimony may be construed as suggesting that Barrick should be viewed as representing the future PCH in the course of drafting the Agreement between CSI and PCH, Tr. at 72:3-72:9, 72:23-73:1 (Condon Test.), the Court does not credit the suggestion for two reasons.  First, the suggestion is in some, albeit not irreconcilable, tension with Condon's testimony that Barrick served as the agent for the assisted living association of which Harvey was President.  Tr. at 74:21-74:25, 78:25-79:4 (Condon Test.).  Second, and more importantly, the suggestion is unsupported and in fact rebutted by countervailing documentary evidence indicating that Barrick's (or, more precisely, PCALIC's) role vis-à-vis the future PCH was to serve as its Marketing Director, Pl.'s Ex. 7 (Draft Marketing Agreement) at PCH000006-000013, and in that capacity would function as PCH's "representative" no more than CSI, as the future PCH's Program Administrator, or Risk Services, as the future PCH's Captive Insurance Company Manager.[4]  At bottom, the record does not support the inference, by a preponderance of

---

[4]  In a draft of a proposed independent marketing agreement between PCALIC and PCH, PCALIC was, like CSI, characterized as an "independent contractor," Pl.'s Ex. 7 (Draft Marketing Agreement) ¶ 2(e), and it was anticipated that PCALIC would receive some form of

the evidence, that Barrick was negotiating on behalf of PCH in the context of drafting the Agreement.

35.     More broadly, the precise nature of the relationship of the three principal entities involved in the formation process – CSI, Risk Services, and PCALIC – to the future PCH is ultimately immaterial; rather, what is significant is that all three (and perhaps other service providers) were jointly working towards the formation of PCH.  As Condon himself testified, after recognizing an unmet need in the market, CSI and "these other service providers [set] about creating a client."  Tr. at 77:11-77:15 (Condon Test.).

36.     In any event, it is undisputed that, while Barrick made changes to an independent marketing agreement between his agency and PCH, he offered no commentary or changes to the Agreement between CSI and PCH.  Tr. at 41:19-41:25, 80:10-80:12, 80:21-80:24 (Condon Test.); Pl.'s Ex. 7 (Feb. 20, 2004 E-mail from D. Condon to T. Winch) at PCH000005. Accordingly, even if there were some credence to Condon's suggestion that Barrick was somehow representing PCH in the course of negotiations, there *still* would be no evidence on the record establishing the understanding or intentions of PCH in executing the Agreement

### H.     Drafting The Agreement: The Involvement Of CSI And Risk Services

37.     The absence of evidence relating to the participation of Harvey and PCH is unsurprising, given that the Agreement between CSI and PCH was just one of several documents prepared in the course of forming PCH, and received little attention from anyone.  However, to the extent there is any evidence on the record concerning the drafting of the Agreement, it relates

---

compensation in exchange for its services as Marketing Director to the future PCH, most likely a percentage of the gross earned premium payments received by or on behalf of PCH for liability insurance coverage.  *Id.* at ¶ 3.

principally to Condon, acting on behalf of CSI, and various employees of Risk Services.

38. Beginning in or about February 2004, Condon and employees of Risk Services exchanged a series of e-mails concerning the Agreement. The two principal figures from Risk Services involved in the preparation of the Agreement between PCH and CSI were Troy Winch ("Winch"), Risk Services' Director of Captive Services, who held the primary responsibility within Risk Services for coordinating the formation of PCH, and Jon Harkavy ("Harkavy"), Risk Services' Executive Vice President and General Counsel. Tr. at 22:18-22:21, 43:24-44:2 (Condon Test.); Tr. at 98:3-98:9, 106:22-107:2, 112:24-113:5 (Harkavy Test.).

39. Although Condon testified that he did not have the authority to exercise "final approval" of the Agreement on behalf of CSI, he nevertheless had the authority and responsibility to, and in fact did, make changes to the Agreement on CSI's behalf. Tr. at 66:22-67:8, 67:21-67:23 (Condon Test.).

40. Condon's proposed changes to the Agreement, directed exclusively towards modifying the provisions governing CSI's compensation and identifying the proper corporate name for CSI, were ultimately incorporated into the final version of the Agreement. Tr. at 28:15-29:1, 53:8-53:25 (Condon Test.); Tr. at 102:9-102:14, 126:15-127:1 (Harkavy Test.); *compare* Pl.'s Ex. 17 (Draft Agreement) ¶ 8, *with* Pl.'s Ex. 4 (Agreement) ¶ 8.

41. Apart from some superficial edits that Harkavy may or may not have made to the Agreement between CSI and PCH, Tr. at 102:4-102:6 (Harkavy Test.), Condon was the only individual to suggest changes to the Agreement.

42. Condon's edits were relatively minor, and did not touch upon any of the provisions relevant to the motion now before the Court. In fact, even Harkavy described Condon

13

as "passive" in hammering out the terms of the Agreement between CSI and PCH, Tr. at 107:8-108:2 (Harkavy Test.), a description entirely consistent with all the evidence on the record indicating that no one dedicated much attention to the Agreement, let alone the Arbitration Clause.

## I.      *Drafting The Agreement: The Arbitration Clause And The Injunction Clause*

43.     Condon credibly testified that he read the entire Agreement.  Tr. at 60:6-60:8 (Condon Test.).  However, Condon did not alter the Agreement's Arbitration Clause or the Injunction Clause.  *Compare* Pl.'s Ex. 17 (Draft Agreement) ¶¶ 14, 17, *with* Pl.'s Ex. 4 (Agreement) ¶¶ 14, 17.

44.     Condon testified that he did not "pa[y] a great deal of attention" to the Injunction Clause, but stated that he did not see any inconsistency between it and the Arbitration Clause. Tr. at 60:12-61:10 (Condon Test.).  Condon's understanding of the relationship between the two provisions was that, in order to compel CSI to perform under the Agreement, PCH could resort to injunctive relief; all other disputes would be resolved by arbitration.  Tr. at 63:8-63:18 (Condon Test.).

45.     Critically, however, Condon did not recall any conversation or discussion among the parties (or even between the parties and non-party Risk Services) with respect to the Arbitration Clause or the Injunction Clause.  Tr. at 56:12-56:14 (Condon Test.).  Condon conceded that those provisions were included in the final version of the Agreement because they were part of an entirely separate agreement discussed in greater detail below.  Tr. at 56:15-56:17 (Condon Test.).

46.     Consistent with Condon's testimony, none of the correspondence concerning the

drafting of the Agreement makes specific reference to arbitration or the Arbitration Clause. Pl.'s Ex. 2 (Nov. 4, 2003 Ltr. from D. Condon to M. Rogers), Ex. 6 (Feb. 18, 2004 E-mail from D. Condon to T. Winch), Ex. 7 (Feb. 20, 2004 E-mail from D. Condon to T. Winch), Ex. 8 (Feb. 23, 2004 E-mail from D. Condon to T. Winch), Ex. 9 (Mar. 16, 2004 E-mail from T. Winch to D. Condon), Ex. 11 (Feb. 24, 2004 E-mail from D. Condon to T. Winch), Ex. 12 (Mar. 8, 2004 E-mail from D. Condon to T. Winch), Ex. 13 (Mar. 8, 2004 E-mail from D. Condon to T. Winch), Ex. 14 (Mar. 16, 2004 E-mail from D. Condon to T. Winch), Ex. 15 (Mar. 16, 2004 E-mail from D. Condon to T. Winch), and Ex. 16 (Mar. 17, 2004 E-mail from D. Condon to T. Winch).

47.     Meanwhile, Harkavy could not even testify definitively whether he was aware at the time that the Agreement was executed that it contained an arbitration provision, explaining that "it was not a subject of great attention" for him. Tr. at 102:19-102:22 (Harkavy Test.).

48.     In any event, Harkavy described his role as limited to ensuring that the Agreement between CSI and PCH would past regulatory muster; in his own words, he played no "substantive role" in crafting the terms of the Agreement. Tr. at 105:20-106:7 (Harkavy Test.). The Court therefore accords little weight to his testimony that he understood that the Arbitration Clause was permissive rather than mandatory, and that the provision merely allocated the costs in the event the parties proceeded to arbitration. Tr. at 108:25-109:15 (Harkavy Test.). The testimony is, moreover, of little import in light of the undisputed fact that Risk Services is not a party to the Agreement and Condon's admission that he did not view Risk Services as negotiating on behalf of the future PCH. Tr. at 85:11-85:20 (Condon Test.).

### J.     Drafting The Agreement: Cannibalizing The Intermodal Agreement

49.     The record is clear: nobody dedicated much attention to the Agreement between

15

CSI and PCH; there were no contemporaneous discussions concerning the Arbitration Clause or the Injunction Clause; and the only material evidence having any bearing upon either provision relates only to CSI's professed understanding, which was never conveyed, in sum or in substance, to PCH or any of its representatives prior to execution of the Agreement. As such, based upon the record created by the parties, the Court's ability to draw any inferences as to what the parties intended by the language they selected in the Arbitration Clause is severely circumscribed. At best, the record permits the Court to conclude that CSI understood the Arbitration Clause to require mandatory arbitration of all disputes arising out of the Agreement, though even the evidence to that effect (*i.e.*, Godfrey and Condon's testimony) is not particularly compelling. Apart from the contractual language itself, the Court has no basis for drawing conclusions as to PCH's understanding of the Arbitration Clause or to what extent there was a shared understanding between CSI and PCH.

50.    Recognizing this, and apparently with an eye towards invoking the doctrine of *contra proferentem*, the parties dedicated the majority of their attention at trial to identifying the origins of the language that ultimately came to form the Agreement between CSI and PCH.

51.    Prior to the formation of PCH and the drafting and execution of the Agreement, CSI (more specifically, Condon) was involved in setting up an unrelated risk retention group for intermodal trucking companies in California. Tr. at 19:1-19:17 (Condon Test.). Together with Risk Services, who was brought into the process by a retail insurance agent operating in California, CSI participated in a similar process of forming a risk retention group for these intermodal trucking companies. Tr. at 19:14-19:17 (Condon Test.). It is undisputed that PCH had no involvement whatsoever in this process.

52.     As part of that transaction, an Administrative Services Agreement was created to govern the relationship between the risk retention group and CSI, as the insurance program administrator (the "Intermodal Agreement").  Tr. at 20:12-20:15 (Condon Test.); Def.'s Ex. 10 (Intermodal Agreement) at PCH000042-000048.  As described below, the Intermodal Agreement became the starting point (and, with minor exceptions, the ending point) for the preparation of the Agreement between CSI and PCH.  Most importantly, the arbitration and injunction clauses in the Intermodal Agreement reappeared verbatim in the Agreement between PCH and CSI.  Tr. at 26:2-26:6, 28:10-28:14 (Condon Test.); *compare* Def.'s Ex. 10 (Intermodal Agreement) ¶¶ 14, 17, *with* Pl.'s Ex. 4 (Agreement) ¶¶ 14, 17.

53.     The parties' disagreement here extends to two questions: first, who was responsible for drafting the Intermodal Agreement in the context of that transaction; and, second, how the Intermodal Agreement later came to be used as the base for the Agreement between CSI and PCH.  On the first question, the Court finds that the origins of the language used in the Intermodal Agreement are indeterminate.  On the second, the Court finds that Risk Services was the first to suggest using the Intermodal Agreement as a template of sorts for the Agreement between CSI and PCH, and that CSI, through Condon, sanctioned its use.  Critically, PCH had no role either in drafting the original Intermodal Agreement or in importing its terms into the Agreement between it and CSI.

54.     Beginning with the first question, no evidence introduced at trial established the provenance of the Intermodal Agreement, let alone the arbitration clause in that agreement.  True, Condon characterized Risk Services as "the source" of the Intermodal Agreement.  Tr. at 23:7-23:14 (Condon Test.).  However, Condon testified that "a combination of people" created the

Intermodal Agreement, with responsibility for the "technical details" falling to Risk Services. Tr. at 20:23-21:3 (Condon Test.). He further conceded that he had no understanding as to the origins of the Intermodal Agreement. Tr. at 85:2-85:4 (Condon Test.). Indeed, he testified that he was never told who drafted the Intermodal Agreement, and only speculated that Risk Services "could have gotten it out of a form book." Tr. at 29:16-29:18, 31:20-31:22, 34:9-34:12, 35:1-35:18 (Condon Test.).

55.     At the same time, Condon's testimony that his own involvement in preparing the Intermodal Agreement was limited, and did not extend to the crafting of the arbitration clause, is unrebutted. Tr. at 25:20-26:1 (Condon Test.). Condon represented that his role in drafting the Intermodal Agreement was limited to supplying the corporate name of CSI and modifying a provision pertaining to CSI's maintenance of certain financial records, Tr. at 20:16-20:20, 29:16-29:21, 65:20-65:23 (Condon Test.), testimony that is consistent with contemporaneous correspondence, Pl.'s Ex. 21 (Nov. 5, 2003 E-mail from D. Condon to J. Harkavy) at PCH000133.

56.     Harkavy's testimony was entirely consistent with Condon's account. Harkavy was forthright in conceding that he was aware of no facts suggesting that the language for the Intermodal Agreement originated with Condon or CSI. Tr. at 114:16-114:20 (Harkavy Test.). Meanwhile, although Harkavy testified that he maintains a stock of various agreements and documents helpful in forming a risk retention group, and that he sometimes makes those agreements and documents available to clients and law firms, Tr. at 100:3-100:11 (Harkavy Test.), the Court credits his testimony that he did not know who drafted the Intermodal Agreement, and that it may have been a "template from another form," Tr. at 100:21-101:6,

125:1-125:4, 125:23-126:14 (Harkavy Test.); *see also* Pl.'s Ex. 8 (Feb. 23, 2004 E-mail from T. Winch to D. Condon) at PCH000018.

57.    From this evidence, the Court's conclusions are necessarily limited: first, Condon, though a participant, was not the sole draftsman of the Intermodal Agreement or its arbitration clause; and second, Risk Services may or may not have supplied the initial draft of the Intermodal Agreement or based its contents on a form it obtained from other sources.  But most significant for the resolution of the issues now before the Court, it is undisputed that PCH had no role in drafting the Intermodal Agreement or its arbitration clause.

58.    Turning to the second question, the record is more illuminating in ascertaining how the Intermodal Agreement later came to be used as the base for the Agreement between CSI and PCH.  In short, Risk Services first suggested, and CSI subsequently sanctioned, the use of the Intermodal Agreement as a starting point for the Agreement between CSI and PCH.  Again, PCH had no role in the matter.

59.    On February 20, 2004, Condon wrote Winch, Risk Services' Director of Captive Resources, requesting a "draft copy" of the program administrator agreement – *i.e.*, the agreement between PCH and CSI.  Pl.'s Ex. 8 (Feb. 20, 2004 E-mail from D. Condon to T. Winch) at PCH000019.  Winch responded by suggesting that, if CSI was going to provide similar services to PCH as it did for the intermodal trucking risk retention group, "it make[s] sense to use that as a base for the CSI agreement, given that both [CSI] and [regulatory authorities] have used/seen that agreement."  Pl.'s Ex. 8 (Feb. 20, 2004 E-mail from T. Winch to D. Condon) at PCH000019; *see also* Tr. at 79:21-80:2 (Condon Test.).

60.    Condon agreed, Tr. at 44:11-44:12 (Condon Test.), and Winch subsequently

forwarded the Intermodal Agreement to him, Pl.'s Ex. 9 (Mar. 16, 2004 E-mail from T. Winch to D. Condon) at PCH000038; Tr. at 45:6-45:7 (Condon Test.). There is no suggestion, nor does the record support the inference, that Risk Services made any changes or edits to the Intermodal Agreement prior to forwarding it to Condon. Tr. at 67:13-67:15 (Condon Test.).

61. Condon was satisfied with the form of the Intermodal Agreement and at first made no attempt to tailor its terms to the transaction between CSI and PCH. Pl.'s Ex. 11 (Feb. 24, 2004 E-mail from D. Condon to T. Winch) at PCH000021; Pl.'s Ex. 12 (Mar. 8, 2004 E-mail from D. Condon to T. Winch) at PCH000023; Pl.'s Ex. 13 (Mar. 8, 2004 E-mail from D. Condon to T. Winch) at PCH000029; Tr. at 47:12-47:18, 48:17-48:20 (Condon Test.); Tr. at 101:14-101:16 (Harkavy Test.).

62. However, Risk services subsequently flagged certain ministerial errors in the draft Agreement. Tr. at 86:12-87:2 (Condon Test.). Specifically, on March 16, 2004, Winch wrote Condon, noting that the version of the Agreement then being considered still reflected terms applicable only to the Intermodal transaction. Pl.'s Ex. 14 (Mar. 16, 2004 E-mail from T. Winch to D. Condon) at PCH000034; Tr. at 51:16-52:3 (Condon Test.). Condon responded, "I guess I didn't pay as much attention to it as I thought I did." Pl.'s Ex. 15 (Mar. 16, 2004 E-mail from D. Condon to T. Winch) at PCH000037; Tr. at 52:13-52:24 (Condon Test.).

63. Thereafter, on March 17, 2004, Condon wrote Winch attaching a draft of the Agreement, incorporating his changes from the Intermodal Agreement, and recommending that the draft be used for the administrative services agreement between CSI and PCH. Pl.'s Ex. 16 (Mar. 17, 2004 E-mail from D. Condon to T. Winch) at PCH000051; Tr. at 54:1-54:4 (Condon Test.). Again, those changes did not relate to the Arbitration Clause or the Injunction Clause.

20

64.     Based on the testimony and documentary evidence presented at trial, the Court

finds that it was Risk Services that first proposed using the Intermodal Agreement as a template

for the Agreement between CSI and PCH, but that Condon, on behalf of CSI, sanctioned and

endorsed its use.

### K.     *Custom And Practice Evidence*

65.     Finally, the parties also sought to introduce evidence at trial concerning the

broader use of arbitration provisions in the insurance industry, as well as in the more specific

context of agreements governing the formation of risk retention groups.[5]  In this regard, CSI

offered the testimony of Condon and Godfrey, while PCH relied upon Harkavy's testimony.

66.     Over the course of his career, Condon has obtained approximately six insurance

designations, including Certified Property and Casualty Underwriter and Registered Professional

Liability Underwriter.  Tr. at 16:8-16:11 (Condon Test.).  Condon considers himself to be an

"expert" in the insurance industry.  Tr. at 37:9-37:11 (Condon Test.).  He is also a licensed

attorney and a member in good standing of the California bar.  Tr. at 16:18-16:24 (Condon

Test.).

67.     Substantively, Condon testified that agreements with standard insurance carriers

"invariably" include arbitration clauses.  Tr. at 83:11-83:19 (Condon Test.).  However, Condon's

generalized testimony did not address the nature of those arbitration clauses or, for that matter,

---

[5]  Although the term "expert" was occasionally deployed by the parties, both sides
effectively relied on the testimony of lay witnesses.  The Court has considered such testimony to
the extent it was rationally based upon the witnesses' observations and personal knowledge.  *See*
Fed. R. Evid. 701; *cf. Medina v. District of Columbia*, __ F. Supp. 2d __, 2010 WL 2473700, at
*19 (D.D.C. June 18, 2010).  The Court need not belabor the point; regardless of how the
testimony is characterized, the Court finds that there is insufficient record support to establish a
discernible custom and practice as to the use of arbitration clauses in this context.

the nature of agreements involving standard insurance carriers and their relationship to agreements involving risk retention groups. Nor did Condon articulate how the language of such clauses compare or contrast to the language at issue in this case. Moreover, Condon admitted that he has only been involved in the creation of two risk retention groups – the one involving intermodal trucking companies in California and the one at issue here. Tr. at 82:25-83:5 (Condon Test.); *see also* Tr. at 90:8-90:11 (Godfrey Test.). In each case, the arbitration clause was subject to the same ambiguity. For these reasons, whether considered together or independently, the Court finds Condon's testimony is entitled to little weight in ascertaining whether there is a custom or practice as to the use of mandatory arbitration clauses in this context.

68.     Godfrey, the President and founder of CSI, has worked in the insurance business for over thirty-five years. Tr. at 88:12-89:5 (Godfrey Test.). During that period, he has formed various insurance-related entities, including his own agency in 1997, a carrier in 1989, and CSI in 1999. Tr. at 88:22-89:5 (Godfrey Test.).

69.     Godfrey testified that arbitration clauses are "very standard" in agreements with insurance carriers, and characterized arbitration as "a standard in the industry," particularly where parties enter into long-term relationships. Tr. at 93:11-94:2 (Godfrey Test.). He further testified that "every [agreement] that [he has] ever seen had [an arbitration agreement] in there." Tr. at 93:18-93:19 (Godfrey Test.). As was the case with Condon, Godfrey's testimony related to the insurance industry as a whole, and did not specifically address agreements involving risk retention groups, with which he admittedly has minimal experience. Tr. at 90:8-90:11 (Godfrey Test.). Godfrey did not specify whether the alleged industry standard was permissive or

mandatory arbitration, nor did he articulate how the language of these clauses compare or contrast to the language at issue in this case. For these reasons, whether considered together or independently, the Court finds Godfrey's testimony to be minimally probative of whether there is a custom or practice as to the use of mandatory arbitration clauses in this context.

70. Harkavy is the Executive Vice President and General Counsel of Risk Services, positions he has held for approximately twenty years. Tr. at 98:3-98:9 (Harkavy Test.). Harkavy testified that he has seen at least fifty risk retention group agreements over the course of his career, and that there is no standard as to the inclusion or content of arbitration clauses in such agreements. Tr. at 104:17-105:4, 117:10-117:18 (Harkavy Test.). When pressed, Harkavy was unable to provide an estimate as to what percentage of such agreements contain arbitration clauses. Tr. at 105:11-105:14 (Harkavy Test.). Harkavy also testified that most arbitration provisions in insurance contracts are more detailed and expansive than the one at issue in this action, and frequently delineate procedures for commencing and conducting arbitration proceedings. Tr. at 103:20-104:16 (Harkavy Test.).

71. The Court finds that Harkavy's somewhat more specific testimony is entitled to some, but not substantial, weight. However, even absent Harkavy's testimony, the Court would find – as it does now – that the record simply does not establish, by a preponderance of the evidence, that there is a custom or practice of using mandatory arbitration clauses either in the risk retention group context or the broader insurance industry.

# III.  CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, the Court makes the following Conclusions of Law:

1.      The Federal Arbitration Act ("FAA") provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Where a district court is satisfied that an issue is referable to arbitration under a written agreement, it must "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  In this regard, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

2.      Determining whether a contract indicates an agreement to arbitrate is typically a task for the courts, rather than arbitrators.  *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide.").

3.      As the Supreme Court has emphasized, the FAA "strongly favors the enforcement of agreements to arbitrate as a means of securing 'prompt, economical and adequate solution of controversies,'" *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 479-80 (1989) (quoting and overruling *Wilko v. Swan*, 346 U.S. 427, 438 (1953)), and requires that

courts "rigorously enforce agreements to arbitrate," *Byrd*, 470 U.S. at 217. In accordance with this salutary statutory purpose, where an agreement contains a valid arbitration clause, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983), and "an order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotation marks and notations omitted).

4.      At the same time, it is fundamental that arbitration is a matter of consent. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, __ U.S. __, 130 S. Ct. 1758, 1775 (2010). Indeed, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs.*, 460 U.S. at 648 (internal quotation marks omitted). The district court may "not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *Equal Emp't Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). "After all, the basic objective . . . is not to resolve disputes in the quickest manner possible . . . but to ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947 (1995) (internal citation and quotation marks omitted).

   **A.      CSI Bears The Burden Of Establishing That The Parties Intended To Agree To The Mandatory Arbitration Of Disputes**

5.      Because arbitration is a matter of consent, the general presumption in favor of arbitrability simply "does not apply to the [threshold] determination of whether there is a valid

agreement to arbitrate between the parties," a question that is resolved by reference to ordinary state-law principles governing the formation of contracts.[6] *Institut Pasteur v. Chiron Corp.*, 2005 WL 366968, at *10 (D.D.C. Feb. 16, 2005) (quoting *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)); *see also First Options*, 514 U.S. at 943-44; *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). It is only after the district court concludes that a binding agreement to arbitrate exists that the presumption in favor of arbitrability comes into effect. *First Options*, 514 U.S. at 944-45. Accordingly, the Court turns to the question of whether CSI, the party who seeks to compel arbitration, has met its burden of establishing the existence of a mandatory agreement to arbitrate disputes between the parties, without the benefit of any presumption for or against arbitrability.

### B.  *The Arbitration Clause Is Ambiguous*[7]

6.     Under District of Columbia law, "the party asserting the existence of a contract has the burden of proving its existence." *Bailey v. Fed. Nat'l Mortg. Ass'n*, 209 F.3d 740, 746 (D.C. Cir. 2000) (citing *Ekedahl v. COREStaff, Inc.*, 183 F.3d 855, 858 (D.C. Cir. 1999) (per curiam)). In this context, that burden extends to proving that there was an agreement to all material terms and that the parties intended to submit to mandatory arbitration. *Bailey*, 209 F.3d at 745. CSI, as the party seeking to compel arbitration, concedes that it bears the burden of proof

---

[6] This Court previously held that the Agreement is governed by District of Columbia law, *PCH Mut. Ins. Co.*, 569 F. Supp. 2d at 72-73, a conclusion only further bolstered by the evidence presented at trial, *see* Tr. at 55:17-55:21 (Condon Test.).

[7] Although the Court previously held that the Arbitration Clause at issue here is ambiguous, *PCH Mut. Ins.*, 569 F. Supp. 2d at 74-77, and CSI concedes the point, *see* Tr. at 12:1-12:2, the Court shall revisit relevant parts of its prior analysis here, as the textual ambiguity necessarily informs other aspects of its decision today.

of establishing the existence of an enforceable agreement. Tr. at 5:25-6:3. For the reasons set forth below, CSI has simply failed to meet that burden.

7.     When charged with construing the terms of a contract, a court should begin with the text of the agreement itself, giving the language chosen by the parties – which is presumed to be the most reliable indicator of the parties' intent – its plain meaning. *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009). The inquiry is an objective one: the court must determine what meaning a "reasonable person in the position of the parties" would attach to the disputed language. *DLY-Adams Place, LLC v. Waste Mgmt. of Md., Inc.*, 2 A.3d 163, 166 (D.C. 2010) (internal quotation marks omitted). In pursuing this inquiry, the court should consider the disputed language within the context of the entire contract, seeking to give effect to each provision. *Hunt Constr. Grp., Inc. v. Nat'l Wrecking Corp.*, 587 F.3d 1119, 1121 (D.C. Cir. 2009).

8.     A contract is not ambiguous merely because the parties disagree over its meaning or could have drafted clearer terms. *Tran ex rel. Estate of Le v. Carr*, 708 F. Supp. 2d 1, 6 (D.D.C. 2010) (citing *Dist. No. 1-Pac. Coast Dist. v. Travelers Cas. & Sur. Co.*, 782 A.2d 269, 274 (D.C. 2001)); *see also In re Bailey*, 883 A.2d 106, 118 (D.C. 2005) ("none of the provisions at issue here are ambiguous, although the agreement is poorly drafted."). "The relevant question is not whether the contract uses the most precise language a court can imagine ex post." *Hunt Constr.*, 587 F.3d at 1122. Instead, "[a] contract is ambiguous when, and only when . . . the provisions in controversy are[] reasonably or fairly susceptible to different constructions [or] interpretations, or two or more different meanings." *DLY-Adams Place*, 2 A.3d at 166-67 (internal quotation marks omitted and notations altered); *accord Mamo v. Skvirsky*, 960 A.2d 595, 599-600 (D.C. 2008). The Court concludes that the Arbitration Clause is reasonably or

fairly susceptible to at least two different constructions.

9.     The Arbitration Clause provides as follows:

> 17.    **Arbitration.**   Any disputes concerning any aspect of this Agreement may be submitted to binding arbitration. The prevailing party shall be entitled to recover all costs incurred, including reasonable attorney's fees.

Pl.'s Ex. 4 (Agreement) ¶ 7.

10.     CSI contends that reading the word "may" in the Arbitration Clause as permissive would amount to no more than a barren recital that the parties might in the future agree to arbitrate a dispute.  True, District of Columbia law does not require parties to employ any "magic words," such as "mandatory" or "binding," to establish an enforceable, mandatory agreement to arbitrate.  *Bryson v. Gere*, 268 F. Supp. 2d 46, 52 (D.D.C. 2003).  CSI is also correct that, under District of Columbia law, "[i]t is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless." *Caglioti v. Dist. Hosp. Partners, LP*, 933 A.2d 800, 811 (D.C. 2007) (quoting *Retail Clerks Int'l Ass'n Local No. 455, AFL-CIO v. Nat'l Labor Relations Bd.*, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975)).  Based upon this principle, the Courts of Appeals for the Fourth and Eighth Circuits have concluded that the use of the word "may" did not render certain arbitration clauses permissive because such an interpretation would leave the clause devoid of meaning.  *See United States v. Bankers Ins. Co.*, 245 F.3d 315, 320-21 (4th Cir. 2001); *Am. Italian Pasta Co. v. Austin Co.*, 914 F.2d 1103 (8th Cir. 1990);[8] *see also Detroit Edison Co. v. Burlington N. & Santa Fe Ry. Co.*, 442

---

[8]  As explained in the Court's prior opinion, the Arbitration Clause at issue in this case departs from the clauses considered by these courts because, in addition to providing that parties "may" submit disputes to binding arbitration, it goes on to provide that the party that prevails in arbitration "shall be entitled to recover all costs incurred, including reasonable attorney's fees."

F. Supp. 2d 387, 391 n.2 (E.D. Mich. 2006) (suggesting that if parties intended to agree only to permissive arbitration, they could have provided that "either party may seek resolution of the question or controversy pursuant to binding arbitration *or through litigation*.") (emphasis in original).

11.     More persuasively, CSI underscores that the Agreement also includes an Injunction Clause reserving to PCH the right to seek an injunction to enforce the Agreement. Pl.'s Ex. 4 (Agreement) ¶ 14.  There is some force to the argument that, unless the Arbitration Clause is read to require mandatory arbitration, there would be little reason to expressly carve out a right to injunctive relief.  Though perhaps a close call, given the relatively perfunctory language chosen by the parties, the presence of the Injunction Clause, and the apparent (but not unresolvable) anomaly that might result if the first sentence was read as merely permissive, it is plausible to interpret the Arbitration Clause as an expression of a mandatory arbitration agreement.

12.     Nevertheless, as a general matter of contract law, the word "may" is viewed as a permissive, rather than mandatory, term, particularly when used in contraposition to the word "shall."  *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 346 (2005); *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 288 (Fed. Cl. 2006), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007).  Indeed, at least one court within this District has persuasively held that the use of the word "may" in an arbitration clause between private parties "evinces the parties' intent not

---

Pl.'s Ex. 4 (Agreement) ¶ 17. As such, another plausible interpretation of the arbitration clause is that arbitration is permissive, not mandatory, but that if the parties agree to arbitrate, the loser pays the winner's attorneys' fees.

to be bound to invoke the arbitration machinery to settle their disputes." *Group Hospitalization & Med. Servs., Inc. v. Stubbs*, 1990 WL 183576, at *2 (D.D.C. Nov. 16, 1990).

13.     Significantly, the first sentence of the Arbitration Clause at issue here provides that any dispute concerning the Agreement "*may* be submitted to binding arbitration," while the second sentence provides that the party that prevails in arbitration "*shall* be entitled to recover all costs incurred, including reasonable attorney's fees." Pl.'s Ex. 4 (Agreement) ¶ 17 (emphasis added). The Court concludes that the provision may reasonably be read merely to contemplate the possibility of arbitration, without mandating its use. Under this interpretation, only where the parties voluntarily elect to proceed to arbitration does the provision's mandatory effect come into play: in such circumstances, the provision would require the losing party to pay the prevailing party's costs and attorneys' fees. In other words, construing its plain language from an objective point of view, the Arbitration Clause may be seen as little more than a fee-shifting provision.

14.     In *Flynn v. Ohio Bldg. Restoration, Inc.*, 260 F. Supp. 2d 156 (D.D.C. 2003), the court addressed a provision with a similar structure in concluding that the parties had not agreed to the use of mandatory grievance procedures. There, the relevant contractual language provided:

> A charge of violation of this Article . . . *may* be filed by the Union and/or the trustees of any of the joint trust funds provided for in this Agreement, and shall be considered a dispute under this Agreement and *shall* be processed in accordance with the procedures for handling of grievances and the final binding resolution of disputes.

*Id.* at 163 (emphasis added). The court construed the interplay between the words "may" and "shall" as merely requiring, in the event the Union or the trustees "exercise[d] their discretion to initiate the arbitration procedures, [that] any such charge must then be processed according to the grievance procedures set forth in the CBA." *Id.* at 166. Likewise, the Arbitration Clause at issue

here may fairly be read to have a mandatory effect (in requiring the shifting of fees) only after the parties have voluntarily decided to litigate their disputes before an arbitral body.

15.     The reasonableness of this construction is supported by the fact that, elsewhere in the Agreement, the parties proved themselves capable of drafting terms with clear binding effect, most often through the use of the word "shall."  *See, e.g.*, Pl.'s Ex. 4 (Agreement) ¶¶ 3, 5-8, 10, 12; *cf. Raytheon Eng'rs & Constructors, Inc. v. SMS Shloemann-Siemag Akiengesellschaft*, 2000 WL 420866, at *3 (N.D. Ill. Mar. 16, 2000) (if the parties intended to grant one another the unilateral right to impose arbitration, separate provisions providing for unilateral rights evidenced that they knew how).  It is also consonant with the parties' proven ability to combine discretionary rights and mandatory obligations through the interplay of the words "may" and "shall."  *See, e.g.*, Pl.'s Ex. 4 (Agreement) ¶¶ 4, 9.

16.     Other aspects of the Arbitration Clause demonstrate further ambiguity as to whether the parties intended to provide for mandatory arbitration of disputes.  The clause does not identify the arbitrator, a method for choosing the arbitrator, or a place of arbitration.  While this shortcoming does not necessarily prove that the parties did not reach a "meeting of the minds," it is probative of whether the parties actually considered or agreed upon all material terms of an agreement to arbitrate.  *Cf. PainWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 463 (5th Cir. 2001) (concluding that failure to identify geographic location for arbitration or the arbitral forum "simply leaves too many critical elements unaddressed to support [the] contention that the . . . Agreement, standing alone, amounts to a binding arbitration agreement between the parties.").

17.     The Court therefore concludes that the Arbitration Clause may reasonably be read

simply as a permissive arbitration clause, coupled with a fee-shifting provision. In fact, given the provision's use of the word "may," considered alongside the parties' proven ability to draft language unequivocally establishing binding rights and obligations, the Court is inclined to conclude that this is the most reasonable reading of the Arbitration Clause. However, based upon the language of the Arbitration Clause alone, the Court cannot determine which of these interpretations is correct as a matter of law.

### C. The Preponderance Of The Extrinsic Evidence Does Not Establish That The Parties Intended To Submit To Mandatory Arbitration

18. Without a "meeting of the minds" as to all material terms, there can be no enforceable contract. *Bailey*, 209 F.3d at 746 (citing *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995)); *see also* Restatement (Second) of Contracts § 201(3) (1981) (where parties to an agreement attached different meanings to a term thereof, and neither party had reason to know of the meaning attached by the other, "neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.").

19. Once a court determines that a contract is ambiguous, the court may look to any extrinsic evidence demonstrating the intent of the parties at the time of contracting. *Dyer*, 983 A.2d at 355; *see also Ekedahl*, 183 F.3d at 858 ("Proof of a meeting of the minds may be found either in the written agreement or, if the agreement is ambiguous, in the parties' actions at the time of contract formation."). Indeed, "[w]here an ambiguity is present, the intent and understanding of the parties is of critical importance." *Howard Univ. v. Lacy*, 828 A.2d 733, 737 (D.C. 2003). Under District of Columbia law, extrinsic evidence may include (a) the circumstances surrounding the making of the contract, including preliminary negotiations and discussions, (b) customary practices of which either party knows or has reason to know, and (c)

the course of conduct of the parties under the contract. *In re Bailey*, 883 A.2d at 118. Even here, however, the focus remains on what a reasonable person in the position of the parties would have thought the disputed language meant. *Dyer*, 983 A.2d at 355.

20. As set forth above, the record is clear: nobody dedicated much attention to the Agreement; there were no contemporaneous discussions regarding the Arbitration Clause; and the only evidence having any bearing upon the parties' interpretation of the Arbitration Clause relates only to CSI's professed understanding, which was never conveyed to PCH or any of its representatives prior to execution of the Agreement. CSI concedes, as it must, that there is no evidence on the record establishing one way or the other whether PCH intended or understood the Arbitration Clause to require mandatory arbitration.[9] Tr. at 146:3-146:19. For obvious reasons, the minimally persuasive testimony from Godfrey and Condon that they unilaterally understood the Arbitration Clause to require mandatory arbitration cannot establish a shared intention or a meeting of the minds between CSI and PCH. Recognizing this, CSI resorts to various arguments, some more half-baked than others, in support of its contention that the parties intended to agree to mandatory arbitration, none of which are of any avail. The Court addresses

---

[9] It is not entirely clear whether CSI's "promoter" theory, discussed in greater detail below, is meant to encompass an argument that Barrick or Risk Services' intent may be imputed to the future PCH. To the extent CSI intends to suggest that Barrick should be viewed as representing the future PCH in the course of drafting the Agreement, the Court has rejected that suggestion. Regardless, the record is clear that Barrick made no changes and offered no commentary to the Agreement. Similarly, to the extent CSI intends to suggest that Risk Services should be viewed as representing the future PCH in the course of drafting the Agreement, the Court has rejected that contention as well. Not only did Condon admit that he did not view Risk Services as negotiating on behalf of PCH, but the record does not permit the inference that any one of the three principal entities involved in the process of forming PCH – CSI, Risk Services, and PCALIC – was more of a "representative" to PCH than the others. In any event, there is no evidence that Risk Services understood the Arbitration Clause to require mandatory arbitration either.

each in turn.

21.     CSI first argues that arbitration clauses are the norm in the insurance industry. Generally, an industry custom or practice must be "definite, uniform, and well known, and it must be established by 'clear and satisfactory evidence.'" *Howard Univ. v. Best*, 547 A.2d 144, 151 (D.C. 1988); *Weaver v. Du Pont*, 119 A.2d 716, 716 (D.C. 1956); *accord Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (applying New York law).  Simply put, CSI has failed to prove, by a preponderance of the evidence, that there is any custom or practice concerning the use of arbitration clauses in this context, let alone one sufficiently "definite, uniform, and well known" to justify its use as extrinsic evidence of the parties' intent.  *See Diskin v. J.P. Stevens & Co., Inc.*, 836 F.2d 47, 51-52 (1st Cir. 1987) (applying New York law, concluding that party could not establish arbitration was customary method of resolving disputes through vague and unspecific evidence).

22.     CSI next argues that the absence of extrinsic evidence is of no moment merely by virtue of the fact that representatives of CSI and PCH signed the Agreement.  The argument is perplexing.  True, a meeting of the minds may be evidenced by the terms of a signed written agreement, *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995), but that truism is of no use here given the patent ambiguity in the Arbitration Clause.  *Cf. Bryson*, 268 F. Supp. 2d at 52 (although arbitration clauses need not expressly state that they are "mandatory," there must nevertheless be "other indications" of an intent to consent to binding arbitration).  The same holds true for CSI's curious argument that principles of equitable estoppel preclude any effort by PCH to suggest that the Agreement is unenforceable on the grounds that PCH had yet to be formed as of the date of the Agreement.  In effect, both arguments beg the question.  PCH has never claimed that it is not

bound by the Agreement or, more specifically, the Arbitration Clause; rather, it has simply maintained that the Arbitration Clause does not require binding arbitration, and CSI has not adduced any evidence suggesting that the parties' shared understanding was otherwise.

23. Even considering all of the extrinsic evidence on the record, the Court cannot conclude that a reasonable person in the position of the parties would have construed the Arbitration Clause as requiring arbitration of the parties' disputes. CSI has simply fallen woefully short of establishing, by a preponderance of the evidence, that there was a "meeting of the minds" between CSI and PCH as to the nature of the Arbitration Clause. There being no "mutual consent on the issue, there [can] be no binding contractual commitment." *Local Union 1395, Int'l Bhd. of Elec. Workers, AFL-CIO v. Nat'l Labor Relations Bd.*, 797 F.2d 1027, 1036 (D.C. Cir. 1986); *see also ISC Holding AG v. Nobel Biocare Invs. N.V.*, 351 Fed. Appx. 480, 481 (2d Cir. 2009) (summary order) ("Without a meeting of the minds such that an enforceable agreement to arbitrate was formed, we will not compel arbitration."). Accordingly, by operation of the Savings Clause and substantive federal arbitration law, the Arbitration Clause in effect drops out from the Agreement. *See Rent-a-Center, W., Inc. v. Jackson*, __ U.S. __, 130 S. Ct. 2772, 2778 (2010) (as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract).

### D. *CSI Cannot Salvage Its Motion By Resort To The Doctrine Of* Contra Proferentem

24. Under the doctrine of *contra proferentem*, "any ambiguity as to [a] contract's meaning will be construed strongly against the drafter." *Dyer*, 983 A.2d at 355; *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (addressing the doctrine within the context of federal arbitration law). "This canon of construction . . . is a 'secondary'

35

standard of interpretation, and inferior to extrinsic proof of the parties' agreement, or to other authority revealing that understanding." *Am. Bldg. Maint. Co. v. L'Enfant Plaza Props., Inc.*, 655 A.2d 858, 863 (D.C. 1995) (internal citation and quotation marks omitted); *accord In re Bailey*, 883 A.2d at 118.

25.    The rationale undergirding the doctrine has been aptly described as follows:

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party.

Restatement (Second) of Contracts § 206 cmt. a; *see also Mastrobuono*, 514 U.S. at 63 ("The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result.").

26.    Clearly, the doctrine cannot be invoked against PCH on the basis that it directly drafted the Agreement (or, more specifically, the Arbitration Clause). The record supports only one conclusion: PCH had no direct role in selecting the language for the Agreement between it and CSI or, for that matter, in deciding to use the Intermodal Agreement as a base for drafting the Agreement. Therefore, PCH cannot be said to be the draftsman of the Agreement; indeed, it was hardly a participant.

27.    Nor does CSI appear to suggest otherwise. Instead, CSI's principal argument (so far as the Court can tell) is as follows: non-party Risk Services drafted Agreement; Risk Services was a "promoter" of the future PCH; therefore, Risk Services' role as the "draftsman" of the Agreement should be imputed to PCH and the doctrine of *contra proferentem* requires the

Arbitration Clause to be interpreted in CSI's favor.  For several reasons, the argument is without merit.

28.     As an initial matter, to the Court's knowledge, no Court has ever extended the "promoter" theory to invoke the doctrine of *contra proferentem* under circumstances such as those presented here.  Under certain circumstances, preliminary contracts executed on a corporation's behalf by its agent before the corporation formally comes into existence may be imputed to the corporation's "promoter" or vice versa.  *See generally* Richard A. Lord, *Williston on Contracts* § 35:71 (4th ed. 2010).  Here, CSI again misconstrues the nature of PCH's objections to arbitration.  PCH has never claimed it is not bound by the Agreement *in toto*; it simply has proffered an alternative, and entirely reasonable, interpretation of the Arbitration Clause.  More to the point, the "promoter" theory has no application here because the Agreement was executed by Harvey, who subsequently became the first president of PCH and a member of its Board of Directors, and not anyone from Risk Services.

29.     In any event, CSI's argument fails at the outset for the simple reason that the record does not support the conclusion that Risk Services drafted the Agreement between CSI and PCH.  Apart from some superficial edits that Harkavy may or may not have made to the Agreement, Condon, on behalf of CSI, was the only individual to make changes to the Agreement.  Further, to the extent the Intermodal Agreement is even relevant, the origins of the language used in that agreement are indeterminate.  *See Champagne v. Victory Homes, Inc.*, 897 A.2d 803, 806 n.5 (Me. 2006) (doctrine of *contra proferentem* could not be invoked where record was silent as to who drafted arbitration provision); *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 51 (1st Cir. 2004) (doctrine of "no utility" where "unclear who drafted the

contract"). There are, of course, instances in which it cannot be determined that one party rather than the other chose the specific words of the contract, and this is one of them. Based on the record created by the parties, there simply is no evidentiary basis for the Court to conclude that Risk Services was the draftsman of the Agreement, or its Arbitration Clause.

30. Moreover, Condon had the capacity to (and in fact did) make changes to the Agreement on CSI's behalf. In fact, he was the only individual to make substantive changes to the Agreement. In addition, while Risk Services was the first to suggest using the Intermodal Agreement as a template for the Agreement between CSI and PCH, the record evidences that CSI, through Condon, sanctioned and in fact endorsed its use. Under these circumstances, there is no credible concern that CSI was somehow unprotected from an unintended or unfair interpretation of the chosen language such that would justify invoking the doctrine of *contra proferentem. See Transformational Strategies Consulting, Inc. v. ACS State Healthcare, LLC*, 526 F. Supp. 2d 66, 71 n.5 (D.D.C. 2007) (applying New York law, concluding that ambiguities could not be construed against the drafter of the parties' initial agreement where both parties participated in the drafting of the amendment).

31. Finally, even assuming, *arguendo*, that Risk Services could be deemed the exclusive draftsman, CSI has not shown that Risk Services was operating as the "promoter" of the future PCH in the context of drafting the Agreement between CSI and PCH. Generally speaking, "promoters" are defined as individuals who take an active part in organizing a corporation prior to its coming into being. *Shoreham Hotel Ltd. P'ship v. Wilder*, 866 F. Supp. 1, 4 (D.D.C. 1994); *see also Jones v. Health Res. Corp. of Am.*, 509 A.2d 1140, 1146 n.15 (D.C. 1986) (promoters procure for the future corporation the rights, instrumentalities, and capital to

enable it to do business). As previously indicated, Condon readily conceded that he did not view Risk Services as negotiating on behalf of PCH in the context of drafting the Agreement, and the record does not permit the inference that any one of the three principal entities involved in the process of forming PCH – CSI, Risk Services, and PCALIC – was more of a "representative" of PCH than the others. If anything, the Court would be inclined to conclude that CSI – whose principal extended a $130,000 loan to PCH to ensure that it would have sufficient capital for its formation – is the most viable candidate for so-called "promoter" status.

32.     For all these reasons, the Court concludes that the doctrine of *contra proferentem* has no applicability to the present Motion.

## IV. CONCLUSION

The Court has considered the remaining arguments tendered by the parties and has concluded that they are without merit. Accordingly, based upon the foregoing Findings of Fact and Conclusions of Law, the Court shall DENY CSI's [8] Motion to Compel Arbitration and Stay Proceedings. An appropriate Order accompanies these Findings of Fact and Conclusions of Law.


Date:   November 15, 2010


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge